No. 01-198

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 81

HARLAN and ELINOR SWANSON,

       Plaintiffs,

v.

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,

       Defendant.


FILED

APR 3 0 2002


Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

CERTIFIED QUESTION FROM:

       United States District Court
       For the District of Montana, Missoula Division
       The Honorable Leif Erickson, Federal Magistrate presiding.

COUNSEL OF RECORD:

       For Plaintiffs:

              Rex Palmer, Attorneys Inc., Missoula, Montana

       For Defendant:

              Jon T. Dyre, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana

       For Amicus:

              Gregory S. Munro, Missoula, Montana (MTLA)

Heard: November 1, 2001
Submitted: November 6, 2001
Decided: April 30, 2002

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The following Certified Questions were presented to this Court by the U.S. District Court for the District of Montana, Missoula Division, on March 19, 2001, and accepted on March 27, 2001:

1. Is subrogation by the insurer to recover medical payments advanced to its insured, and later paid by the tortfeasor, void in Montana as against public policy?

2. Is it the public policy in Montana that an insured must be totally reimbursed for all losses as well as costs, including attorney fees, involved in recovering those losses before the insurer can exercise any right of subrogation, regardless of contract language to the contrary?

3. Does a provision in an insurance policy issued in Colorado, stating that Colorado law governs the insurer's subrogation rights for [personal injury protection] PIP benefits, violate Montana's public policy, if Colorado law allows subrogation regardless of whether the insured has been made whole and fully compensated, including attorney fees and costs?

¶2 We answer Certified Questions #2 and #3 in the affirmative. We do not answer Question #1.

**FACTUAL BACKGROUND**

¶3 Elinor and Harlan Swanson divide their time between their two residences, spending at least six months per year in Plains, Montana, and the remaining time traveling or in their home in Colorado Springs, Colorado. They have owned their Montana home since the early 1960s but lease the land on which it is built from the U.S. Forest Service. They have owned their Colorado home since 1981.

2

¶4 On August 4, 1998, while driving their Montana-licensed Chevrolet Suburban through Ravalli, Montana, to Plains, the Swansons were involved in a motor vehicle accident with a USF/Reddaway (Reddaway) tractor-trailer. Both Mr. and Mrs. Swanson were injured in the accident and subsequently incurred over $50,000.00 in medical expenses, most of which was incurred in Montana.

¶5 The Swansons were insured through the Hartford Insurance Company of the Midwest (Hartford). They had purchased their automobile insurance policy in Colorado several years before the accident and had paid all premiums required under the policy. Included in this policy were several provisions that are relevant in determining the answers to the certified questions. They are:

1. a provision for "PIP" coverage, a Colorado-statutorily required type of no-fault insurance also known as "personal injury protection." Colo. Rev. Stat. §§ 10-4-701 et seq. Under PIP coverage, Hartford is required to pay certain types of losses and expenses, including medical expenses, lost wages and rehabilitation expenses;

2. a subrogation clause granting Hartford the right to recover any payments it pays to an insured under PIP coverage in the event the insured recovers damages from the party responsible for the bodily injury; and

3. a choice of law provision stating that any dispute concerning the denial or delay of PIP benefits or subrogation rights will be governed by Colorado law.

¶6 After the accident, the Swansons made claims under their policy for PIP coverage. Hartford paid some of the claims but denied others. Hartford subsequently learned that Reddaway's insurer, Constitution State Service Company (Constitution), intended to make payments to the Swansons. On October 7, 1998, Hartford wrote a "subrogation claim" letter

3

to Constitution, notifying Constitution of its intent to pursue subrogation to recover monies it had paid on behalf of the Swansons.

¶7 On November 20, 1998, Constitution issued a check on behalf of Reddaway for $25,962.60, payable to Elinor Swanson and Hartford, indicating on the face of the check that it was for "advance payment of medical expenses."

¶8 In mid-December, 1998, Mrs. Swanson endorsed the check and forwarded it to Hartford with a letter from her attorney requesting that Hartford endorse the check and return it to her. Hartford did not do so at that time, but on March 23, 2000, after the Swansons had filed an action against Hartford, Hartford endorsed the check, returned it to Mrs. Swanson and waived its subrogation rights.

¶9 On November 11, 1999, the Swansons settled their personal injury claims against Reddaway. This settlement did not exceed the Swanson's actual damages and did not include any compensation for attorney fees or costs incurred by the Swansons to obtain recovery from Reddaway, nor did it reimburse the Swansons for insurance premiums paid to Hartford since the origination of their automobile policy. However, it is undisputed that Reddaway's limits of liability exceeded the amount of the settlement reached between the Swansons and Reddaway.

¶10 At some unspecified date prior to March 23, 2000, the Swansons filed an action against Hartford in the Fourth Judicial District Court of Montana, Missoula County, asserting that Hartford had breached the insurance contract and had violated the Unfair Claims

4

Settlement Practices Act, § 33-18-201, *et seq.*, MCA. Hartford had the case removed to the United States District Court for the District of Montana, Missoula Division, and filed a motion for partial summary judgment, requesting that the District Court determine that Colorado law governed Hartford's subrogation rights vis-à-vis the Swansons' settlement with Reddaway. The parties fully briefed the issues and participated in oral argument.

¶11    On March 19, 2001, Federal Magistrate Judge Leif B. Erickson submitted a Certification Order to this Court with the above three certified questions. This Court accepted the certification on March 27, 2001.

¶12    On September 6, 2001, this Court ordered the parties to present briefs and oral arguments to the Court en banc on November 1, 2001. In addition to the parties participating in oral argument, we granted the Montana Trial Lawyers Association (MTLA) leave to appear as amicus curiae.

## DISCUSSION

¶13    We shall first address Certified Question # 2.

¶14    Certified Question # 2: Is it the public policy in Montana that an insured must be totally reimbursed for all losses as well as costs, including attorney fees, involved in recovering those losses before the insurer can exercise any right of subrogation, regardless of contract language to the contrary?

We answer this question affirmatively.

¶15    In 1977, this Court established the "made whole" doctrine to be applied in insurance subrogation cases. The doctrine required that an insured be "made whole" before an insurer could assert its subrogation rights, which meant that, not only must the insured recover all

5

of her losses but also all costs of recovery as well, such as attorney fees and costs of litigation. In other words, borrowing from the language of Certified Question # 2, the insured must be "totally reimbursed for all losses as well as costs, including attorney fees." See *Skauge v. Mountain States Tel. and Tel.Co.* (1977), 172 Mont. 521, 565 P.2d 628.

¶16   In *Skauge*, the Skauges lost all their personal possessions when their rented home exploded and burned. The Skauges were insured through the Unigard Insurance Group, with personal property limits of $4,000.00 with a $400.00 incidental living expense allowance. The policy also contained a subrogation clause that read: "This Company may require from the insured an assignment of all rights of recovery against any party for loss to the extent that payment therefore is made by this Company." *Skauge*, 172 Mont. at 523, 565 P.2d at 629.

¶17   Unigard determined that the Skauges' loss exceeded the policy coverage and delivered to the Skauges' attorney a check for $4,328.98 and a proof of loss for the Skauges' signature. However, Skauges refused to give Unigard an assignment of rights. Skauges then attempted to recover the balance of their $11,000+ loss from the tortfeasors, and Unigard asserted its subrogation rights. *Skauge*, 172 Mont. at 523, 565 P.2d at 629.

¶18   The district court ruled that Unigard's adjuster and the Skauges had no "meeting of the minds" as to the subrogation issues and therefore Unigard was entitled to subrogation up to $4,328.98, which was the amount it had paid. *Skauge*, 172 Mont. at 524, 565 P.2d at 629-30. The Skauges appealed and this Court held, "that when the insured has sustained a loss in excess of the reimbursement by the insurer, the insured is entitled to be made whole for

6

his entire loss and any costs of recovery, including attorneys fees, before the insurer can assert its right of legal subrogation against the insured or the tort-feasor." *Skauge*, 172 Mont. at 528, 565 P.2d at 632.

¶19 The Court explained its equitable holding by stating, "[w]hen the sum recovered by the Insured from the Tort-feasor is less than the total loss and thus either the Insured or the Insurer must to some extent go unpaid, *the loss should be borne by the insurer for that is a risk the insured has paid it to assume.*" (Emphasis in original.) *Skauge*, 172 Mont. at 528, 565 P.2d at 632.

¶20 This Court reaffirmed *Skauge* in 1994 in *DeTienne Assoc. v. Farmers Union Mut. Ins.*, 266 Mont. 184, 879 P.2d 704. In *DeTienne*, we restated the purpose of subrogation as being "to prevent injustice by 'compelling the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment.'" *DeTienne*, 266 Mont. at 188, 879 P.2d at 707 (citing *Youngblood v. American States Ins. Co.* (1993), 262 Mont. 391, 866 P.2d 203.) We rejected the insurer's argument that its contract's subrogation clause mandated that it be reimbursed for all monies it had paid to its insured, and reiterated the "made whole" policy established in *Skauge*. We explained that the policy subrogation clause

> by its own terms, [did] not extend subrogation beyond the equitable principles set out in *Skauge*. The clause permits [the insurer] to subrogate -- it does not dictate upon what terms that subrogation shall occur. The terms of subrogation are not provided by the parties' contract, here, but are provided by the equitable principles inherent in the *Skauge* ruling.

7

*DeTienne*, 266 Mont. at 190, 879 P.2d at 708. Thus, we held that the principles announced in *Skauge* dictated how subrogation rights would be administered, and not the blanket language of the insurance policy.

¶21 As recently as August 2001, this Court again implemented the "made whole" policy in *State Compensation Ins. Fund v. McMillan*, 2001 MT 168, 306 Mont. 155, 31 P.3d 347. In *McMillan*, we held that the Montana State Compensation Insurance Fund could not assert its subrogation claim in the context of a workers' compensation claim until the injured worker had fully recovered his losses, as determined by the district court in a declaratory action preceding the workers' compensation action, as well as all costs of recovery. *McMillan*, 2001 MT 168, 306 Mont. 155, 31 P.3d 347.

¶22 Hartford argues that because the Montana Legislature revised § 33-23-203(2), MCA, in 1997 to allow for "reasonable subrogation" and declined to specifically include a "made whole" requirement in the statute, this Court "cannot add what has been omitted." Swansons, on the other hand, argue that we must presume that the Legislature was fully aware of the well-established equitable common law doctrine adopted in Montana, and that it could have easily excluded some portion of that doctrine, if it chose. We agree with Swansons. *Gaustad v. City of Columbus* (1994), 265 Mont. 379, 877 P.2d 470 ("We presume that the legislature is aware of the existing law, including our decisions interpreting individual statutes. . . . We presume that if the legislature disagreed with our interpretation . . ., it would have amended the statute accordingly. It did not do so."); *In re Wilson's Estate*

8

(1936), 102 Mont. 178, 194, 56 P.2d 733, 737 ("In the enactment of any law the legislature is presumed to proceed having in mind the existing law. . . ."). Therefore, we conclude that § 33-23-203(2), MCA (1997), as revised by the Legislature, approved subrogation clauses "designed to prevent duplicate payments for the same element of loss under a motor vehicle liability policy or under another casualty policy" and that under Montana's established common law, duplicate payments do not occur until the insured has been made whole for all losses, as well as costs of recovery.

¶23 The consistent jurisprudence underlying our past and current "made whole" cases and the policy established by them are not in conflict with the revised statute. Rather, the common law and the statute jointly establish two rules of subrogation--an insured should not receive duplicate payments for the same element of loss, and the insurer may not assert subrogation rights until the insured has been fully compensated for his damages, including attorney fees and costs.

¶24 In his dissent, Justice Rice concludes that the "made whole" doctrine " . . . cannot possibly be applied to risks that the insurer has not been paid to assume." This assertion is surprising in light of the fact that Justice Rice authored our opinion in *McMillan*, wherein this Court reaffirmed the "made whole" doctrine in response to the State Fund's attempt to assert a subrogation claim against McMillan's third-party tort recovery. We concluded in *McMillan* that State Fund could not assert its subrogation interest until McMillan had recovered "the amount of his entire loss of $4.7 million plus costs of recovery . . ." *McMillan*, ¶15. It goes

9

without saying that the State Fund did not begin to cover all of McMillan's losses, and that, when he sought and was awarded $4.7 million for the tortfeasor, McMillan was awarded damages far in excess of those the State Fund either paid or had a contractual duty to assume. Nonetheless, relying squarely on the "made whole" doctrine, this Court absolutely precluded State Fund from asserting a subrogation interest against *any* amounts awarded to McMillan, making no distinction between those amounts awarded him for losses covered by State Fund, and those amounts awarded for damages in excess of those covered by State Fund. The dissent's conclusion that proper application of the "made whole" doctrine would not permit the insured to recover unrelated losses before the insurer is entitled to subrogate for the particular losses it was paid to assume, therefore appears to fly in the face of our unequivocal holding in *McMillan*.

¶25   In his concurring and dissenting opinion, Justice Leaphart maintains that our holding is too broad, and that an insurer should be allowed its subrogation rights once the insured has been made whole, including costs and attorney fees, as to that element of damages for which she purchased insurance. Theoretically, the logic of his argument is appealing. If a plaintiff recovered a discrete amount from her insurer for a particular element of loss, and then recovered the identical amount from a third party, plus her costs and attorney fees associated with that recovery, and the amounts of each were specifically and separately determined either by agreement or in a judgment, then, in theory, subrogation should proceed. In the alternative, as Justice Rice suggests, the subrogating insurer could simply recover its

10

payment, less that amount attributable to the costs and fees associated with the recovery. However, there is a fundamental practical flaw in either analysis.

¶26 Seldom to never do we find such perfect symmetry in an award or settlement. Typically, as here, the ultimate settlement (or judgment amount) is for a gross amount, without allocation for each particular element of loss. Thus, we would be left to speculate as to whether the insured did recover the identical amount of the loss for which the insurer seeks subrogation. Perhaps the jury assumed the plaintiff had medical payments coverage, and did not award the full amount of the medical bills. Even more typical and pervasive is the situation where a settling insurer, knowing full well that the plaintiff had medical payments coverage, takes this into account in its settlement offer and reduces its offer accordingly. In either instance, there is not a duplicate payment. However, if we were to accept Justice Leaphart's and Justice Rice's proposed solution, we would have to engage in the presumption that the insured was compensated for the loss and reimburse the insurer, regardless of the presence of these factors. Quite plainly, this would resolve the question of who should go uncompensated in favor of the insurer who has collected a premium for its services, and against the injured plaintiff who could very well end up sacrificing a portion of her uncompensated recovery for the benefit of the insurer.

¶27 Twenty-five years ago, we said in *Skauge* that, if one must to some extent go uncompensated, it should be the insurer rather than the injured party. *Skauge*, 172 Mont. at 528, 565 P.2d at 632. The only practical way we can satisfy this principle is to allow full

11

compensation to the plaintiff first, before subrogation is allowed.

¶28    We therefore hold that it is the public policy in Montana that an insured must be totally reimbursed for all losses as well as costs, including attorney fees, involved in recovering those losses before the insurer can exercise any right of subrogation, regardless of any contract language providing to the contrary. We also conclude that this policy is not in conflict with § 33-23-203(2), MCA (1997).

¶29    Certified Question #3: Does a provision in an insurance policy issued in Colorado, stating that Colorado law governs the insurer's subrogation rights for [personal injury protection] PIP benefits, violate Montana's public policy, if Colorado law allows subrogation regardless of whether the insured has been made whole and fully compensated, including attorney fees and costs?

¶30    Having concluded that the Hartford policy language runs contrary to Montana's "made whole" doctrine, we must determine whether the policy provision providing that Colorado law governs Hartford's subrogation rights for PIP benefits is applicable.

¶31    As Hartford points out in its brief, Section IV, Part F of the Swanson's Hartford policy concludes with the following sentence granting Hartford rights of subrogation:

> [Hartford] shall be entitled to recovery under Paragraphs A [right to subrogate directly against a third party tortfeasor] and B [right to subrogate against insured who recovers damages from third party tortfeasor] only after the person has been full [sic] compensated for damages by another party.

Hartford argues that this clause is to be interpreted in accordance with Colorado law and, that under Colorado law, "an insured is deemed to be fully compensated when the tortfeasor's insurance coverage exceeds the reasonable compensation paid to the injured person by the tortfeasor's insurer."

12

¶32 We addressed a very similar situation in *Youngblood*. The insurance policy in *Youngblood* contained a choice of law provision favoring Oregon law. Applying Oregon law would have resulted in medical payment subrogation, which was precluded under Montana law. In *Youngblood*, we reaffirmed our earlier decision in *Allstate Ins. Co. v. Reitler* (1981), 192 Mont. 351, 628 P.2d 667, in which we held that subrogation of medical payment benefits was void in Montana as against public policy. While this Court has previously held that, "if a contract's terms are clear and unambiguous, the contract language will be enforced," *Youngblood*, 262 Mont. at 395, 866 P.2d at 205 (citing *Keller v. Dooling* (1991), 248 Mont. 535, 539, 813 P.2d 437, 440), we have also acknowledged an exception to that rule. "The only exception to enforcing an unambiguous contract term is if that term violates public policy or is against good morals." *Youngblood*, 262 Mont. at 395, 866 P.2d at 205 (citing *Steinke v. Boeing Co.* (D. Mont. 1981), 525 F.Supp. 234, 236). This exception is applicable here. Applying *Youngblood*, we find the Colorado provision in the Hartford policy here void as against our public policy. Application of Colorado law would result in the allowance of subrogation before an insured has been made whole, which violates Montana public policy.

¶33 Therefore, we conclude that application of the Colorado choice of law provision violates Montana public policy, and that Montana's "made whole" doctrine shall be applied to the subrogation provision.

¶34 Having answered Certified Questions #2 and #3 in the affirmative, it is unnecessary to the facts and dispute of this case to address the broad scope of Certified Question #1.

13

Therefore, we decline to answer it.

/s/ Patricia Cotter
Justice

We Concur:

_____
Chief Justice

/s/ [signature]
/s/ [signature]
/s/ [signature]
_____
Justices

14

Justice W. William Leaphart concurring in part and dissenting in part.

¶35    I concur with the Court's resolution as to issue number three.  For the following reasons, I dissent as to issue number two.

¶36    The majority opinion holds that "an insured must be totally reimbursed for all losses as well as costs, including attorney fees . . . before the insurer can exercise any right of subrogation."  While I agree that an insured should be made whole before an insurer can exercise its subrogation right, I disagree with the Court's broad interpretation of when an insured is made whole.  The majority concludes that an insured is only made whole when he has been compensated for **all** losses, apparently including losses that may not have been covered by the insurer.  I would hold that, for purposes of an insurer's subrogation right, an insured is made whole when she has been fully compensated, including costs and attorney fees, for that element of damage for which she purchased insurance.  When an amount recovered from a third party (or its insurer) can be broken down and attributed to separate elements of a claim, either through settlement documents or through special interrogatories at trial, subrogation is reasonable.

¶37    Subrogation is a device of equity.  "The theory behind this principle is that absent repayment of the insurer the insured would be unjustly enriched by virtue of recovery from both the insurer and the wrongdoer, or in absence of such double recovery by the insured, the third party would go free despite his legal obligation in connection with [the] loss." *Skauge*, 172 Mont. at 524-25, 565 P.2d at 630.

15

¶38 In *Skauge*, we noted that when an insured recovers an amount from the tortfeasor that is less than the total loss, "the loss should be borne by the insurer *for that is a risk the insured has paid it to assume.*" *Skauge*, 172 Mont. at 528, 565 P.2d at 632 (emphasis added).

¶39 In that case, the Skauges lost all of their personal possessions in a fire. Their personal property insurer paid them their policy limit, approximately $4300. Skauges then brought a negligence action against third parties, alleging over $11,000 in total damages. We held that the Skauges' insurer could not assert its subrogation right until Skauges had been "made whole for [their] entire loss and any costs of recovery, including attorney's fees." *Skauge*, 172 Mont. at 528, 565 P.2d at 632.

¶40 In *Skauge*, the insurer had been paid to assume the risk of damage to Skauges' personal property. Until Skauges had been fully compensated for their loss of personal property, they had not been "made whole."

¶41 In the present case, Hartford was paid to assume the risk that Swansons would incur medical expenses. Because of the lack of a record in this case, we do not know whether the Swansons were "made whole" as to their medical expenses and we do not know what other elements of damage were included in their settlement from the tortfeasor. All we know is that Hartford paid "some" medical expenses, that the tortfeasor's company, Constitution, paid one check towards medicals in the amount of $25,962 and Swansons' total medical expenses exceeded $50,000. Without knowing the total medical expenses and how much Hartford paid toward them, we cannot tell whether Swansons were made whole as to that loss. If

16

Swansons have not been made whole as to their medical expenses, then there is no right of subrogation, as it would be unreasonable. On the other hand, if Swansons have received medical payments in excess of their actual medical expenses, Montana public policy, pursuant to § 33-23-203, MCA, allows for reasonable subrogation.

¶42 To deny Hartford's right of subrogation unless Swansons recover for other elements of damage would have the effect of making Hartford an insurer against those uninsured losses as well as medical expenses. Swansons, however, have not paid for protection beyond their medical expenses. *See Ludwig v. Farm Bureau Mutual Insurance Co.* (Iowa 1986), 393 N.W.2d 143.

¶43 By way of a hypothetical, assume that Jim has insurance through Acme Insurance Company on a painting valued at $20,000. While transporting the painting to his home, Jim is involved in an automobile accident. The painting is destroyed, his car is totaled and Jim is injured. Acme pays Jim $20,000 for the painting. The other driver's insurance company pays Jim $35,000 for property damage: $20,000 for the painting and $15,000 for his vehicle. The company also pays Jim $25,000 for his personal injuries. However, his medical expenses were $30,000.

¶44 As I read the majority opinion, even though Jim has received duplicate payments for the same element of loss (the painting), Acme would not be allowed to subrogate since Jim has not been fully compensated for all his losses–that is, he suffered $30,000 in medical expenses and has only been paid $25,000.

17

¶45    The "made whole" doctrine has to be applied to the risk which was insured against. In the example, the risk assumed by Acme was that the painting would be damaged. Acme did not assume the risk that Jim would suffer personal injury. It did not insure Jim against "all losses." If Jim has been made whole as to the risk for which he paid premiums and for which Acme insured, then Acme must be allowed to subrogate. "Made whole" means that Jim has recovered all his costs and attorney fees incurred in collecting the duplicate payment from the tortfeasor.

¶46    Montana's statute, § 33-23-203(2), MCA, allows for reasonable subrogation clauses "that are designed to prevent duplicate payments for the *same element of loss* under the motor vehicle liability policy or under another casualty policy that provides coverage . . . ." (emphasis added). The Court's interpretation of the "made whole" doctrine is premised on the assumption that "typically, as here, the ultimate settlement (or judgment amount) is for a gross amount, without allocation for each particular element of loss."[1] In thus assuming that *typical* settlements cannot be allocated, the Court, in effect, writes the "same element of loss" language out of the statute and conveniently neglects to factor that requirement into its "made whole" analysis. The statutory language, however, requires a case by case determination of whether an allocation as to the "same element of loss" is practical.

¶47    If we are to give effect to both the concept of "reasonable subrogation" and the "same element of loss" language in § 33-23-203(2), MCA, we must interpret the statute as

---

[1] Contrary to the Court's assumption that the settlement here was a "gross amount without allocation," the stipulated facts indicate that it was allocated to "advance payment of medical expenses."

18

allowing subrogation by the injured party's insurer once the insured has received a duplicate payment from a third party insurer for the "same element of loss." In other words, under the provisions of § 33-23-203(2), MCA, the prerequisite for reasonable subrogation is not whether the insured as been indemnified for "all losses" but whether he or she has been indemnified by a third party for the "same element of loss" as that which was insured.

_/s/ W. William Leaphart_
Justice

Chief Justice Karla M. Gray joins in the foregoing concurring and dissenting opinion of Justice Leaphart.

_/s/ Karla M. Gray_
Chief Justice

19

Justice Jim Rice concurring in part and dissenting in part.

¶48    I dissent from the Court's answer to question two.

¶49    As a matter of public policy, subrogation by an insurer of payments made to the insured pursuant to a medical payment policy violates the basic tenets of insurance coverage. The insured is forced to return the benefits for which he has paid, reimbursing the insurer, who thus avoids the risk of loss which it was paid to assume, while nonetheless keeping the premiums it has received. Premiums are no doubt premised upon the anticipated orchestration of this scheme, and pursuit of the wrongdoer by the insurer is encouraged. However, recognizing the effect of subrogation on the insurance consumer, this Court held that medical payment subrogation clauses are violative of public policy in *Allstate Insurance v. Reitler*.

¶50    *Reitler* was reaffirmed in *Youngblood v. American States*, even in the face of the insurer's assertion that subrogation was authorized under § 33-23-203, MCA. Although subrogation was authorized by statute in other insurance contexts, the Court noted that it was not referenced in § 33-23-203, MCA, and refused to read the right of subrogation into the statute.

¶51    The Legislature responded to *Youngblood* by enacting Chapter 263, Laws of Montana (1997), entitled "An Act Establishing Subrogation Rights in Motor Vehicle Liability Policies; and Amending Section 33-23-203." This section was thus amended to read as follows:

> (2) A motor vehicle liability policy may also provide for other reasonable limitations, exclusions, reductions of coverage, *or subrogation clauses that are designed to prevent duplicate payments for the same element*

20

*of loss* under the motor vehicle liability policy or under another casualty policy that provides coverage for an injury that necessitates damages or benefit payments. [Emphasis added.]

¶52 The Legislature thus revised the public policy declared by this Court in *Reitler* and validated "reasonable" subrogation clauses which are designed to prevent duplicate payments for the same element of loss. However oxymoronic the term "reasonable subrogation" may appear in light of the above-noted effects of subrogation on the insurance consumer, it is clear that motor vehicle policies may now properly include such clauses.

¶53 Pursuant to the terms of the policy at issue here, Hartford paid certain medical costs incurred by Swansons. When Constitution then made payment to Swansons for the same medical costs, Hartford sought to subrogate against Constitution's payment. Because Constitution's payment was a "duplicate payment for the same element of loss," Hartford's attempt, pursuant to its policy, to subrogate against Constitution's medical expense payment was permissible under the 1997 amendment to § 33-23-203, MCA. As the Court acknowledges in ¶ 22, the legislation specifically authorizes subrogation in this circumstance.

¶54 However, the Court responds to the legislation by holding that a duplicate payment for medical expenses is not really a duplicate payment until the insured has recovered all other damages related to the accident. The Court reasons in ¶ 22 that because the Legislature did not address the made whole doctrine within the amendment, it intended the doctrine to remain intact, and, consequently, the doctrine forestalls subrogation until the insured has fully recovered all elements of loss. While the Court's reluctance to yield our anti-

21

subrogation policy to legislative enactment is understandable, it erroneously applies the made whole doctrine to avoid doing so.

¶55 Our cases establish that the doctrine is premised upon the principle that the insurer has received a premium to take the risk that the insured will be damaged, and that the insured must be made whole before the insurer can exercise its subrogation interest:

> [W]e adopt the view that when the insured has sustained a loss *in excess of the reimbursement by the insurer*, the insured is entitled to be made whole for his entire loss and any costs of recovery, including attorney's fees, before the insurer can assert its right of legal subrogation against the insured or the tort-feasor.

*Skauge*, 172 Mont. at 528, 565 P.2d at 632 (emphasis added).

> [T]he important aspect of the [*Skauge*] case is the adoption of the equitable principle that an insured must be totally reimbursed for all losses as well as the costs involved in recovering those losses. *The insured has paid premiums to be insured.*

*DiTienne*, 266 Mont. at 191, 879 P.2d at 708-09 (emphasis added).

> [I]t is equitable that the loss be born by the insurer which had been paid an insurance premium for the assumption of its liability. . . . *The key aspect is that the insurer has been paid for the assumption of the liability for the claim,* and that where the claimant has not been made whole, equity concludes that it is the insurer which should stand the loss, rather than the claimant.

*Zacher v. American Insurance Co.* (1990), 243 Mont. 226, 230-31, 794 P.2d 335, 338 (emphasis added). These cases clearly demonstrate that the made whole doctrine is completely premised upon the principle that the insurer has assumed the risk for the insured's loss. The doctrine cannot possibly be applied to risks that the insurer has not been paid to assume.

22

¶56     According to the submitted facts, the premiums paid by Swansons purchased coverage from Hartford for medical expenses, lost wages and rehabilitation expenses. Therefore, Hartford did not assume the risk that Swansons would be fully compensated for other damages they may suffer from the accident—it assumed the risk only for those damages for which coverage was provided under the policy. Swansons have pursued recovery of losses not covered by the Hartford policy. By applying the made whole doctrine to Hartford's subrogation interest, the Court is holding Hartford hostage to Swansons' recovery of damages that are beyond the risk that Hartford was paid to assume. This violates the fundamental premise upon which the made whole doctrine is founded.

¶57     Swansons paid a premium for the medical benefits that were provided under the Hartford policy. Thus, under the made whole doctrine, they are entitled to be made whole prior to Hartford's subrogation of those payments. Proper application of the doctrine here requires Swansons to be reimbursed by Hartford for their attorney fees and costs associated with their recovery of medical damages from Constitution, so that Hartford bears the burden of the costs of recovery of those damages. However, the doctrine does not require that Swansons recover losses not insured by Hartford's policy before Hartford is entitled to subrogate for the particular losses it was paid to assume.

¶58     The Court sees inconsistency between this dissent and our decision in *McMillan*. It states that McMillan was awarded damages in excess of those the State Fund had a contractual duty to assume, and that our application of the made whole doctrine there did not distinguish between the amounts awarded for losses covered by the State Fund and those not

23

covered by the Fund. The Court is correct in stating that we made no such distinction in *McMillan*; it was not at issue there. In *McMillan*, we addressed the State Fund's request to be *released* from contractual obligations it had been paid to assume. Here, Hartford does not seek to be released from its obligations. Rather, Hartford has completely *fulfilled* its contractual obligation and undertaken all of the risks it was paid to assume. Further, an entirely different statute governs here.

¶59 In *McMillan*, the State Fund petitioned, pursuant to the subrogation provisions of § 39-71-414, MCA (1985), of the Workers' Compensation Act, to terminate its continuing contractual obligation to pay workers' compensation payments, arguing that it could subrogate its obligation against McMillan's partial third party recovery. This Court correctly determined that the subrogation statute at issue did not relieve the Fund of its contractual obligation to pay benefits until such time as McMillan had been made whole for his injuries. Our holding was premised on State Fund's assumption of the risk that it would have to fulfill the entirety of its contractual obligation: "the insurer has been paid for the assumption of the liability for the claim." *McMillan*, ¶16. Thus, *McMillan* addressed the obligation of an insurer for risks it had assumed. Here, the Court is improperly applying the doctrine to risks the insurer did not assume.

¶60 The made whole doctrine provides that when a claimant's third party recovery is less than the losses sustained by the claimant, and for which the insurer has paid the claimant, then the insurer must bear the deficit:

24

> [T]he basic conclusion is that when the amount recovered by a claimant is less than the claimant's total loss, with a result that either the claimant or the insurer must to some extent go unpaid, then it is equitable that the loss be born [sic] by the insurer which had been paid an insurance premium for the assumption of its liability.

*McMillan*, ¶ 9, quoting *Zacher v. American Ins. Co.*, supra. A proper understanding of the doctrine illustrates that it equitably distributes unrecovered loss in the contractual relationship between insurer and insured. It is premised upon the insurer's assumption of a risk for which it has been paid a premium, and thus places any deficit in the recovery of those losses on the insurer. Thus, as stated in *McMillan*, it is the insurer which "must to some extent go unpaid," and must bear the claimant's cost of recovery.

¶61 However, the Court here applies the doctrine to damages unrelated to the insurer's acceptance of premium and the accompanying risk. Application of the doctrine in such manner divorces it from the principles upon which this Court founded it in *Skauge*, and applied it in all subsequent cases. The Court now uses the doctrine as an untethered bludgeon to prevent the recovery to which the insurer is statutorily entitled.

¶62 To the extent that I would require a Colorado insurance policy to conform to Montana public policy, I concur with the Court's answer to question three.

_____
Justice

25